Michael R. Lozeau (State Bar No. 142893)
Douglas J. Chermak (State Bar No. 233382)
LOZEAU DRURY LLP
410 12th Street, Suite 250
Oakland, CA 94607
Tel: (510) 836-4200
Fax: (510) 836-4205
E-mail: michael@lozeaudrury.com
        doug@lozeaudrury.com

Brian Segee (State Bar No. 200795)
ENVIRONMENTAL DEFENSE CENTER
111 W. Topa Topa Street Ojai, California  93023
Tel: (805) 640-1832
Fax: (805) 648-8043
Email: bsegee@EnvironmentalDefenseCenter.org

Attorneys for Plaintiff
ENVIRONMENTAL DEFENSE CENTER

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENVIRONMENTAL DEFENSE CENTER, a non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>CALIFORNIA RESOURCES CORPORATION, a corporation,<br><br>Defendant. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

COMPLAINT

1

ENVIRONMENTAL DEFENSE CENTER ("EDC"), a California non-profit association, by and through its counsel, hereby alleges:

## I.   **JURISDICTION AND VENUE**

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq.* (the "Clean Water Act" or "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On January 19, 2016, Plaintiff provided notice of Defendant's violations of the Act, and of Plaintiff's intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Los Angeles Region ("Regional Board"); and to Defendant, as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of EDC's notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on Defendant and the State and federal agencies.  Plaintiff is informed and believes, and thereupon alleges, that neither the EPA nor the State of California has commenced or is diligently prosecuting a court action to redress the violations alleged in this complaint. This action's claim for civil penalties is not barred by any prior administrative penalty under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

4.      Venue is proper in the Central District of California pursuant to Section

COMPLAINT

505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is located within this judicial district.

## II.   **INTRODUCTION**

5.     This complaint seeks relief for Defendant's discharges of polluted storm water and non-storm water pollutants from Defendant's South Mountain oil and gas field located at 19242 South Mountain Road in Santa Paula, California ("South Mountain" or "Facility") in violation of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit No. CAS000001, State Water Resources Control Board Water Quality Order No. 97-03-DWQ ("1997 Permit"), as renewed by Water Quality Order No. 2014-0057-DWQ ("2015 Permit") (the permits are collectively referred to hereinafter as the "Permit" or "General Permit").  Defendant's violations of the discharge, treatment technology, monitoring requirements, and other procedural and substantive requirements of the Permit and the Act are ongoing and continuous.

## III.   **PARTIES**

6.     Plaintiff EDC is a California non-profit corporation and law firm with its principal place of business located at 906 Garden Street, Santa Barbara, CA 93101, and offices also located at 111 W. Topa Topa Street, Ojai, CA  93023.  EDC was founded in 1977 and is dedicated to the preservation and enhancement of the local environment through education, advocacy, and legal action.  EDC represents itself and other organizations in protecting coast and ocean resources, open spaces and wildlife, and human and environmental health. EDC has approximately 3,000 members, including scientists, lawyers, students and citizens who live, recreate, and work in and around waters of the State of California, including the Pacific Ocean and coastal creeks flowing into the Ocean from the South Mountain oil and gas field.  EDC was formed to empower local citizens "to protect themselves and their communities" by serving as "the legal action arm of the environmental community."  EDC brings this

COMPLAINT

action on behalf of its members.  EDC's interests in reducing Defendant's discharges of pollutants into the Pacific Ocean and coastal creeks flowing into the Ocean and requiring Defendant to comply with the requirements of the General Permit are germane to its purposes.  Litigation of the claims asserted and relief requested in this Complaint does not require the participation in this lawsuit of individual members of EDC.

7.     Members of EDC reside in coastal communities that value and depend upon the Pacific Ocean, as well as the surface waters which eventually flow into the ocean.  The South Mountain oil and gas field is located near the Santa Clara River and Calleguas Creek in Ventura County.  These waters flow into the Pacific Ocean. Members of EDC use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged.  Plaintiff's members use these areas to swim, bird watch, boat, sail, kayak, surf, view wildlife, fish, and engage in scientific study including monitoring activities, among other things. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments.  Thus, the interests of Plaintiff's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit.  The relief sought herein will redress the harms to Plaintiff caused or contributed to by Defendant's activities.

8.     Continuing commission of the acts and omissions alleged above will irreparably harm Plaintiff and one or more of its members, for which harm they have no plain, speedy or adequate remedy at law.

9.     Defendant California Resources Corporation ("CRC") is a corporation organized under the laws of California.  CRC's business focuses on the exploration and development of oil and gas resources in California, and the company is the largest oil and gas producer in the state.  CRC operates several additional oil and gas fields in addition to the South Mountain oil and gas field at issue in this action.

COMPLAINT

4

## IV.   **STATUTORY BACKGROUND**

10.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act. Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

11.     Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program. 33 U.S.C. § 1342(p). States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers. 33 U.S.C. § 1342(p).

12.     Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits including general NPDES permits in California.

13.     The State Board elected to issue a statewide general permit for industrial storm water discharges. The State Board originally issued the General Permit on or about November 19, 1991. The State Board modified the General Permit on or about September 17, 1992. Pertinent to this action, the State Board reissued the General Permit on or about April 17, 1997 (the "1997 Permit"), and again on or about April 1, 2014 (the "2015 Permit"), pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p). The 1997 Permit was in effect between 1997 and June 30, 2015. The 2015 Permit went into effect on July 1, 2015. The 2015 Permit maintains or makes more stringent the same requirements as the 1997 Permit.

14.     In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit. 33 U.S.C. § 1311(a).

COMPLAINT

15.     The General Permit contains several prohibitions.  Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology Economically Achievable ("BAT") for toxic and nonconventional pollutants and the Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.  Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm water discharges that cause or threaten to cause pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground water that adversely impact human health or the environment.  Receiving Water Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that cause or contribute to an exceedance of any applicable water quality standards contained in Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

16.     In addition to absolute prohibitions, the General Permit contains a variety of substantive and procedural requirements that dischargers must meet.  Facilities discharging, or having the potential to discharge, storm water associated with industrial activity that have not obtained an individual NPDES permit must apply for coverage under the State's General Permit by filing a Notice of Intent to Comply ("NOI").  Dischargers have been required to file NOIs since March 30, 1992.

17.     Dischargers must develop and implement a Storm Water Pollution Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The General Permit requires that an initial SWPPP has been developed and implemented before October 1, 1992.  The objective of the SWPPP requirement is to identify and evaluate sources

COMPLAINT

6

of pollutants associated with industrial activities that may affect the quality of storm water discharges and authorized non-stormwater discharges from the facility, and to implement best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water discharges and authorized non-storm water discharges.  *See* 1997 Permit § A(2); 2015 Permit § X(C).  These BMPs must achieve compliance with the General Permit's effluent limitations and receiving water limitations, including the BAT and BCT technology mandates.  To ensure compliance with the General Permit, the SWPPP must be evaluated and revised as necessary.  1997 Permit §§ A(9), (10); 2015 Permit § X(B).  Failure to develop or implement an adequate SWPPP, or update or revise an existing SWPPP as required, is a violation of the General Permit.  2015 Permit Fact Sheet § I(1).

18.     Sections A(3)-A(10) of the 1997 Permit set forth the requirements for a SWPPP.  Among other requirements, the SWPPP must include: a pollution prevention team; a site map; a list of significant materials handled and stored at the site; a description of potential pollutant sources; an assessment of potential pollutant sources; and a description of the BMPs to be implemented at the facility that will reduce or prevent pollutants in storm water discharges and authorized non-stormwater discharges, including structural BMPs where non-structural BMPs are not effective.  Sections X(D) – X(I) of the 2015 Permit set forth essentially the same SWPPP requirements as the 1997 Permit, except that all dischargers are now required to develop and implement a set of minimum BMPs, as well as any advanced BMPs as necessary to achieve BAT/BCT, which serve as the basis for compliance with the 2015 Permit's technology-based effluent limitations and receiving water limitations.  See 2015 Permit § X(H).  The 2015 Permit further requires a more comprehensive assessment of potential pollutant sources than the 1997 Permit; more specific BMP descriptions; and an additional BMP summary table identifying each identified area of industrial activity, the associated industrial pollutant sources, the industrial pollutants,

and the BMPs being implemented.  See 2015 Permit §§ X(G)(2), (4), (5).

19.     The 2015 Permit requires dischargers to implement and maintain, to the extent feasible, all of the following minimum BMPs in order to reduce or prevent pollutants in industrial storm water discharges: good housekeeping, preventive maintenance, spill and leak prevention and response, material handling and waste management, erosion and sediment controls, an employee training program, and quality assurance and record keeping.  *See* 2015 Permit, § X(H)(1).  Failure to implement all of these minimum BMPs is a violation of the 2015 Permit.  See 2015 Permit Fact Sheet § I(2)(o).  The 2015 Permit further requires dischargers to implement and maintain, to the extent feasible, any one or more of the following advanced BMPs necessary to reduce or prevent discharges of pollutants in industrial storm water discharges: exposure minimization BMPs, storm water containment and discharge reduction BMPs, treatment control BMPs, and other advanced BMPs.  See 2015 Permit, § X(H)(2).  Failure to implement advanced BMPs as necessary to achieve compliance with either technology or water quality standards is a violation of the 2015 Permit.  *Id*.  The 2015 Permit also requires that the SWPPP include BMP Descriptions and a BMP Summary Table.  *See* 2015 Permit § X(H)(4), (5).

20.     The General Permit requires dischargers to develop and implement an adequate written Monitoring and Reporting Program.  The primary objective of the Monitoring and Reporting Program is to detect and measure the concentrations of pollutants in a facility's discharge to ensure compliance with the General Permit's discharge prohibitions, effluent limitations, and receiving water limitations.  As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether pollution control measures set out in the SWPPP are adequate and properly implemented.  The 1997 Permit required dischargers to collect storm water samples during the first hour of

discharge from the first storm event of the wet season, and at least one other storm event during the wet season, from all storm water discharge locations at a facility.  *See* 1997 Permit, § B(5).  The 2015 Permit now mandates that facility operators sample *four* (rather than two) storm water discharges from all discharge locations over the course of the reporting year.  *See* 2015 Permit, §§ XI(B)(2), (3).

21.    Facilities are required to make monthly visual observations of storm water discharges.  The visual observations must represent the quality and quantity of the facility's storm water discharges from the storm event.  1997 Permit, § B(7); 2015 Permit, § XI.A.

22.    Under the 1997 Permit, facilities must analyze storm water samples for "toxic chemicals and other pollutants that are likely to be present in storm water discharges in significant quantities."  1997 Permit, Section B(5)(c)(ii).  Under the 2015 Permit, facilities must analyze storm water samples for "[a]dditional parameters identified by the Discharger on a facility-specific basis that serve as indicators of the presence of all industrial pollutants identified in the pollutant source assessment."  2015 Permit, Section XI(B)(6)(c).

23.    The General Permit does not provide for any mixing zones by dischargers.  The General Permit does not provide for any receiving water dilution credits to be applied by dischargers.

24.    The Regional Board has established water quality standards for the Los Angeles River Watershed in the "Water Quality Control Plan – Los Angeles Region: Basin Plan for the Coastal Watersheds of Los Angeles and Ventura Counties", generally referred to as the Basin Plan.

25.    The Basin Plan includes a narrative toxicity standard which states that "[a]ll waters shall be maintained free of toxic substances in concentrations that are toxic to, or that produce detrimental physiological responses in, human, plant, animal, or aquatic life."

COMPLAINT

9

26.     The Basin Plan provides that "[w]aters shall not contain suspended or settleable material in concentrations that cause nuisance or adversely affect beneficial uses."

27.     The Basin Plan provides that "[t]he pH of bays or estuaries [or inland surface waters] shall not be depressed below 6.5 or raised above 8.5 as a result of waste discharges."

28.     The Basin Plan provides that "[s]urface waters shall not contain concentrations of chemical constituents in amounts that adversely affect any designated beneficial use."

29.     The Basin Plan provides that "[w]aters shall not contain floating materials, including solids, liquids, foams, and scum, in concentrations that cause nuisance or adversely affect beneficial uses."

30.     The Basin Plan provides that "[w]aters shall be free of coloration that causes nuisance or adversely affects beneficial uses."

31.     The Basin Plan provides that "[w]aters shall be free of changes in turbidity that cause nuisance or adversely affect beneficial uses."

32.     EPA has established Parameter Benchmark Values as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite BAT and BCT.  These benchmarks represent pollutant concentrations at which a storm water discharge could potentially impair, or contribute to impairing, water quality, or affect human health from ingestion of water or fish.  The following EPA benchmarks have been established for pollution parameters applicable to South Mountain: pH—6.0-9.0 s.u.; total suspended solids ("TSS")—100 mg/L; specific conductance ("SC")—200 uhmos/cm; total organic carbon ("TOC")—110 mg/L; oil and grease ("O&G")—15 mg/L; and iron—1.0 mg/L./L.

33.     These benchmarks are reflected in the 2015 Permit in the form of Numeric Action Levels ("NALs").  The 2015 Permit incorporates annual NALs,

which reflect the 2008 MSGP benchmark values, and instantaneous maximum NALs, which are derived from a Water Board dataset. The following annual NALs have been established under the 2015 Permit: TSS—100 mg/L; O&G—15 mg/L; and iron—1.0 mg/L. An exceedance of annual NALs occurs whenthe average of all samples obtained for an entire facility during a single reporting year is greater than a particular annual NAL. The reporting year runs from July 1 to June 30. The 2015 Permit also establishes the following instantaneous NALs: pH—6.0-9.0 s.u.; TSS—400 mg/L; and O&G—25 mg/L. An instantaneous maximum NAL exceedance occurs when two or more analytical results from samples taken for any single parameter within a reporting year exceed the instantaneous maximum NAL value (for TSS and O&G) or are outside of the instantaneous maximum NAL range for pH. When a discharger exceeds an applicable NAL, it is elevated to "Level 1 Status," which requires a revision of the SWPPP and additional BMPs. If a discharger exceeds an applicable NAL during Level 1 Status, it is then elevated to "Level 2 Status." For Level 2 Status, a discharger is required to submit an Action Plan requiring a demonstration of either additional BMPs to prevent exceedances, a determination that the exceedance is solely due to non-industrial pollutant sources, or a determination that the exceedance is solely due to the presence of the pollutant in the natural background.

34. Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements. 33 U.S.C. §§1365(a)(1) and (f), § 1362(5). An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a). Violators of the Act are also subject to an assessment of civil penalties of up to $37,500 per day per violation, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365. *See also* 40 C.F.R. §§ 19.1 - 19.4.

COMPLAINT

## V.   STATEMENT OF FACTS

35.    Defendant CRC owns and/or operates the South Mountain oil and gas field, a 5,757 acre facility located within unincorporated Ventura County to the southeast of the City of Santa Paula.

36.    The Facility falls within SIC Code 1311 (crude petroleum & natural gas). The SIC Manual defines SIC code 1311 as including "[e]stablishments primarily engaged in operating oil and gas field properties. Such activities may include exploration for crude petroleum and natural gas; drilling, completing, and equipping wells; operation of separators, emulsion breakers, desilting equipment, and field gathering lines for crude petroleum; and all other activities in the preparation of oil and gas up to the point of shipment from the producing property." *Available at*: https://www.osha.gov/pls/imis/sic_manual.display?id=387&tab= description.  On information and belief, EDC alleges that the industrial activities conducted at the South Mountain oil and gas field include well drilling, well completion and stimulation, oil production, equipment cleaning and repairing, site closures and remediation, road maintenance, and road construction.

37.    Based on the Facility's Notice of Intent to Comply with the Terms of the Industrial General Permit ("NOI") and SWPPP, review of aerial photography, and EDC's information and belief, storm water is collected and discharged from the 5,757-acre oil and gas field through a diverse range of point sources dispersed throughout the field, including but not limited to numerous well pad sites, road and well pad construction, road drainage infrastructure, erosion gullies and channels associated with roads and pads, and storage and processing units.

38.    For example, CRC continues to maintain an extensive road system throughout the South Mountain oil and gas field.  According to EDC's information and belief, including visual observation from areas outside the field, and the review of aerial photographs, numerous erosion gullies and channels caused by runoff from the

COMPLAINT

12

Facility's roads exist throughout the Facility.  These roads and erosion gullies discharge substantial quantities of sediment, turbidity, TDS, and other pollutants to the creeks within the oil and gas field and subsequently the Santa Clara River, Calleguas Creek, and the Pacific Ocean.  Numerous landslides with erosion gullies and channels have also resulted from the Facility's construction and maintenance of roads, drilling pads, and other features that have undercut adjacent hillsides and caused landslides and subsequent erosion channels.

39.     Defendant channels and collects storm water falling on the Facility through a series of channels that lead to at least four storm water outfalls.  Storm water from the various point sources within the South Mountain oil and gas field is eventually discharged to channels that flow into either the Santa Clara River or into Calleguas Creek, which both in turn flow into the Pacific Ocean.

40.     As stated by the EPA, "oil, gas and mining facilities are among those industrial sites that are likely to discharge storm water runoff that is contaminated by process wastes, toxic pollutants, hazardous substances, or oil and grease," and that "such contamination can include disturbed soils and process wastes containing heavy metals or suspended or dissolved solids, salts, surfactants, or solvents used or produced in oil and gas operations." *NPDES Permit Application Requirements for Storm water Discharges*, 55 Fed. Reg. 47,990 at p. 55-56 (Nov. 16, 1990).  EPA notes that because oil and gas operations such as the Rincon Grubb oil field "have the potential for serious water quality impacts, Congress recognized . . . the need to control storm water discharges from oil, gas, and mining operations." *Id.*

41.     Plaintiff is informed and believes, and thereupon alleges that the storm water flows over the surface of the Facility's industrial features, collecting suspended sediment, dirt, and other pollutants as it flows towards the storm water channels.  Storm water and any pollutants contained in that storm water enters the channels or drains, flows into the creeks draining the field, and ultimately into the Santa Clara

1    River, Calleguas Creek, and the Pacific Ocean.

2         42.    On information and belief, Plaintiff alleges that the majority of storm

3    water discharges from the Facility contain storm water that is commingled with runoff

4    from areas at the Facility where industrial processes occur.

5         43.    Plaintiff is informed and believes, and thereupon alleges, that the

6    management practices at the South Mountain oil and gas field are currently inadequate

7    to prevent the sources of contamination described above from causing the discharge of

8    pollutants to waters of the United States.  The Facility lacks sufficient structural

9    controls such as grading, berming, roofing, containment, or drainage structures to

10   prevent rainfall and storm water flows from coming into contact with exposed areas of

11   contaminants.  The Facility lacks sufficient structural controls to prevent the discharge

12   of water once contaminated.  The Facility lacks adequate storm water pollution

13   treatment technologies to treat storm water once contaminated.

14        44.    Since at least April 5, 2011, Defendant has taken samples or arranged for

15   samples to be taken of storm water discharges at the Facility.  The sample results were

16   reported in the Facility's annual reports submitted to the Regional Board.  Defendant

17   certified each of those annual reports pursuant to the General Permit.

18        45.    In annual reports submitted to the Regional Board for the past five years,

19   the Facility has consistently reported extremely high pollutant levels from its

20   sampling results in all of its storm water sampling locations.  The Facility's

21   measurements of TSS have been particularly elevated, with readings *orders of*

22   *magnitude* above EPA's benchmark level of 100 mg/L for TSS.

23        46.    The Facility has reported several discharges in excess of narrative and

24   numeric water quality standards established in the Basin Plan.  These observations

25   have thus violated narrative and numeric water quality standards established in the

26   Basin Plan and have thus violated Discharge Prohibition A(2) and Receiving Water

27   Limitations C(1) and C(2) of the 1997 Permit; Discharge Prohibitions III(C) and

28

COMPLAINT

14

III(D) and Receiving Water Limitations VI(A) and VI(B) of the 2015 Permit; and are evidence of ongoing violations of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit. On November 30, 2012, the Facility observed tan and silty storm water discharged from the Wintz, Willard Canyon, and Main Gate discharge locations. These discharges violate the narrative standards set forth in the Basin Plan for discoloration and turbidity. On March 21, 2011, the Facility measured storm water discharges with pH levels of 9.42 and 9.24 from the South Mountain and Willard Canyon discharge locations, respectively. On December 2, 2014, the Facility measured a storm water discharge with a pH level of 9.1 from the Willard Canyon discharge location. These discharges are in violation of the water quality standard for pH of 6.5 – 8.5 set forth in the Basin Plan.

47.     The levels of TSS in storm water detected by the Facility have exceeded the benchmark value and annual NAL for TSS of 100 mg/L established by EPA and the State Board, respectively, and the instantaneous NAL value for TSS of 400 mg/L established by the State Board. For example, on December 2, 2014, the level of TSS measured by Defendant at one of its outfalls was 9,360 mg/L. That level of TSS is over 90 times the benchmark value and annual NAL for TSS. CRC also has measured levels of TSS in storm water discharged from the Facility in excess of 100 mg/L in nearly every discharge from the Facility during the past five years, including the following dates: January 5, 2016; December 12, 2014; February 28, 2014; November 30, 2012; January 21, 2012; and March 21, 2011. Specific dates on which Defendant has measured such exceedances, and the levels and locations of such exceedances, are contained in the Notice Letter attached as Exhibit A.

48.     In an attachment to its SWPPP, CRC asserts that it has been exempted from reporting limits for TSS, based on its claim that TSS has been demonstrated to be a "natural background" pollutant. The 2015 Permit includes "Natural Background Pollutant Source Demonstration" as a category of "Exceedance Response Actions

("ERAs").  2015 Permit,§ XII(D)(2)(c).  In order to qualify as an ERA under this category, the discharger must meet nine requirements, including the fundamental requirement to show that the pollutant exceedance (in this case, TSS) is "attributable *solely* to the presence of the pollutant in the natural background that has not been disturbed by industrial activities."  On information and belief, EDC alleges that CRC has not made this demonstration, and accordingly is not exempt from TSS effluent limitation requirements under the General Permit.

49.    The levels of iron in storm water detected by the Facility have exceeded the benchmark value and annual NAL for iron of 1 mg/L established by EPA and the State Board, respectively.  For example, on February 28, 2014, the level of iron measured by Defendant at one of its outfalls was 14 mg/L.  That level of TSS is 14 times the benchmark value and annual NAL for TSS.  CRC also has measured levels of iron in storm water discharged from the Facility in excess of 1 mg/L on the following dates: December 12, 2014; and December 2, 2014.  Specific dates on which Defendant has measured such exceedances, and the levels and locations of such exceedances, are contained in the Notice Letter attached as Exhibit A.

50.    The levels of pH in storm water detected by the Facility have exceeded the benchmark value and annual NAL for pH of 6.0 – 9.0 SU established by EPA and the State Board, respectively.  On December 2, 2014, the Facility measured a pH level of 9.1 SU at the Willard Canyon discharge location.  On March 21, 2011, the Facility measured storm water discharges with pH levels of 9.42 and 9.24 from the South Mountain and Willard Canyon discharge locations, respectively.

51.    During the 2011-2012, 2012-2013, 2013-2014, and 2014-2015 wet seasons, the Facility only sampled from one storm event, which the Facility claimed was the first storm event of the wet season, and failed to collect samples from a second storm event.  In the explanations for these failures to sample, the Facility repeatedly claimed that no qualifying storm events occurred during the reporting

COMPLAINT

period, or that no storms generated sufficient flow for sampling.  On information and belief, EDC alleges that there were numerous sampling opportunities during these reporting periods for the Facility to conduct the required sampling and analysis. These dates are contained in the Notice Letter attached as Exhibit A.

52.     On information and belief, EDC alleges that CRC has continually failed to monitor storm water discharges from a number of discharge locations at the Facility.  These locations include additional point sources associated with road drainage infrastructure, erosion gullies and channels associated with roads and pads, and in-stream detention basins.

53.     On information and belief, EDC alleges that CRC failed to conduct any monthly visual observations during the 2010-2011 wet season.  At a minimum, visual observations should have been conducted on March 21, 2011, when the Facility collected storm water samples from three discharge locations.

54.     On information and belief, EDC alleges that CRC failed to conduct any monthly visual observations during the 2011-2012 wet season.  The Facility's explanation that there were no discharges is insufficient.  Indeed, CRC collected four storm water samples on January 21, 2012, and it should have conducted monthly visual observations on that date.  Attachment A of Exhibit A also shows several months during the 2011-2012 wet season when, on information and belief, EDC alleges that discharges occurred.

55.     On information and belief, EDC alleges that CRC failed to conduct any monthly visual observations during the 2012-2013 wet season with the exception of November 2012.  Attachment A of Exhibit A shows rain events during several months of the 2012-2013 wet season when, on information and belief, EDC alleges that discharges occurred.

56.     On information and belief, EDC alleges that CRC failed to conduct any monthly visual observations during the 2013-2014 wet season with the exception of

February 2014.  Attachment A of Exhibit A shows rain events during several months of the 2013-2014 wet season when, on information and belief, EDC alleges that discharges occurred.

57.     On information and belief, EDC alleges that CRC failed to conduct any monthly visual observations during the 2014-2015, notwithstanding that the Facility collected a number of storm water samples during December 2014.  Attachment A of Exhibit A shows rain events during several months of the 2014-2015 wet season when, on information and belief, EDC alleges that discharges occurred.

58.     On information and belief, EDC alleges that CRC failed to properly record its visual observations of storm water discharges on December 2, 2014.  On this date, South Mountain conducted observations of storm water discharges and did not report observing any pollutants.  However, the Facility's storm water sampling results for these dates indicate levels of TSS well above the benchmark value and average NAL of 100 mg/L – levels at which EDC alleges that CRC should be observing the presence of cloudiness or discoloration in its storm water discharges. These discharges contained TSS concentrations of 9,360 mg/L, 2,070 mg/L, 5,470 mg/L, 1,150 mg/L, and 900 mg/L.  EDC alleges that it would be impossible for waters with TSS concentrations in this range to be free of cloudiness or discoloration.

59.     On information and belief, EDC alleges that CRC has failed to monitor for a number of pollutants in storm water discharges at the Facility, including but not limited to total petroleum hydrocarbons, chemical oxygen demand, chlorides, barium, naphthalene, phenanthrene, benzene, lead, arsenic, fluoride, acetone, toluene, ethanol xylenes, barium, antimony, aluminum, zinc, antimony, copper, mercury, and nickel.

60.     On information and belief, EDC alleges that CRC failed to analyze its storm water discharges for iron during the 2011-2012 and 2012-2013 wet seasons, as well is an all discharges sampled subsequent to the 2014-2015 wet season.

61.     On information and belief, Plaintiff alleges that since at least April 5,

COMPLAINT

18

2011, Defendant has failed to implement BAT and BCT at the Facility for their discharges of TSS, pH, iron, and other un-monitored pollutants. Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit requires that Defendant implement BAT for toxic and nonconventional pollutants and BCT for conventional pollutants by no later than October 1, 1992. As of the date of this Complaint, Defendant has failed to implement BAT and BCT.

62.     On information and belief, Plaintiff alleges that since at least April 5, 2011, Defendant has failed to implement an adequate SWPPP for the Facility. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not set forth site-specific best management practices for the Facility that are consistent with BAT or BCT for the Facility. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for the Facility does not include an adequate assessment of potential pollutant sources, including information such as a quantification of the number and size of well pads and other industrial areas as well as identification of the Facility's road network as a pollutant source; fails to include required BMP descriptions; fails to identify the pollutants that each BMP is designed to reduce or prevent; fails to justify each minimum and advanced BMP not being implemented. According to information available to EDC, Defendant's SWPPP has not been evaluated to ensure its effectiveness and revised where necessary to further reduce pollutant discharges. Plaintiff is informed and believes, and thereupon alleges, that the SWPPP does not include each of the mandatory elements required by the General Permit.

63.     Information available to EDC indicates that as a result of these practices, storm water containing excessive pollutants is being discharged during rain events to channels that flow to either the Santa Clara River or Calleguas Creek, and then ultimately flow to the Pacific Ocean.

64.     Plaintiff is informed and believes, and thereupon alleges, that Defendant

has failed and continues to fail to alter the Facility's SWPPP and site-specific BMPs consistent with the General Permit.

65.     Information available to Plaintiff indicates that Defendant has not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## VI.   CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### Failure to Implement the Best Available and
### Best Conventional Treatment Technologies
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

66.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

67.     The General Permit's SWPPP requirements and Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit require dischargers to reduce or prevent pollutants in their storm water discharges through implementation of BAT for toxic and nonconventional pollutants and BCT for conventional pollutants.  Defendant has failed to implement BAT and BCT at the Facility for its discharges of TSS, pH, iron, and other un-monitored pollutants in violation of Effluent Limitation B(3) of the 1997 Permit and Effluent Limitation V(A) of the 2015 Permit.

68.     Each day since April 5, 2011, that Defendant has failed to develop and implement BAT and BCT in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

69.     Defendant has been in violation of the BAT/BCT requirements every day since April 5, 2011.  Defendant continues to be in violation of the BAT/BCT

COMPLAINT

1    requirements each day that they fail to develop and fully implement BAT/BCT at the

2    Facility.

3                        **SECOND CAUSE OF ACTION**
                       **Discharges of Contaminated Storm Water**
4                  **in Violation of Permit Conditions and the Act**
                        **(Violations of 33 U.S.C. §§ 1311, 1342)**
5

6        70.    Plaintiff re-alleges and incorporates all of the preceding paragraphs as if

7    fully set forth herein.

8        71.    Discharge Prohibition A(2) of the 1997 Permit and Discharge Prohibition

9    III(C) of the 2015 Permit prohibit storm water discharges and authorized non-storm

10   water discharges that cause or threaten to cause pollution, contamination, or nuisance.

11   Receiving Water Limitation C(1) of the 1997 Permit and Receiving Water Limitation

12   VI(B) of the 2015 Permit prohibit storm water discharges to any surface or ground

13   water that adversely impact human health or the environment.  Receiving Water

14   Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and

15   Discharge Prohibition III(D) of the 2015 Permit prohibit storm water discharges that

16   cause or contribute to an exceedance of any applicable water quality standards

17   contained in Statewide Water Quality Control Plan or the applicable Regional Board's

18   Basin Plan.

19       72.    Plaintiff is informed and believes, and thereupon alleges, that since at least

20   April 5, 2011, Defendant has been discharging polluted storm water from the Facility

21   in excess of applicable water quality standards in violation of Receiving Water

22   Limitation C(2) of the 1997 Permit and Receiving Water Limitation VI(A) and

23   Discharge Prohibition III(D) of the 2015 Permit.

24       73.    During every rain event, storm water flows freely over exposed materials,

25   waste products, and other accumulated pollutants at the Facility, becoming

26   contaminated with sediment, iron, and other un-monitored pollutants at levels above

27   applicable water quality standards.  The storm water then flows untreated to channels

28

COMPLAINT

that flow to either the Santa Clara River or Calleguas Creek, and then ultimately flow to the Pacific Ocean.

74.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

75.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

76.     Every day since at least April 5, 2011, that Defendant has discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

### THIRD CAUSE OF ACTION
### Failure to Prepare, Implement, Review, and Update
### an Adequate Storm Water Pollution Prevention Plan
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

77.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

78.     The General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

79.     Defendant has failed to develop and implement an adequate SWPPP for the Facility.  Defendant's ongoing failure to develop and implement an adequate SWPPP for the Facility is evidenced by, *inter alia*, Defendant's failure to include an adequate assessment of potential pollutant sources, failure to include required BMP

COMPLAINT

22

descriptions; failure to identify the pollutants that each BMP is designed to reduce or prevent; and failure to justify each minimum and advanced BMP not being implemented.

80.     Defendant has failed to update the Facility's SWPPP in response to the analytical results of the Facility's storm water monitoring.

81.     Each day since April 5, 2011, that Defendant has failed to develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

82.     Defendant has been in violation of the SWPPP requirements every day since April 5, 2011.  Defendant continues to be in violation of the SWPPP requirements each day that it fails to develop and fully implement an adequate SWPPP for the Facility.

### FOURTH CAUSE OF ACTION
**Failure to Develop and Implement an
Adequate Monitoring and Reporting Program
(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

83.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

84.     The General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

85.     Defendant has failed to develop and implement an adequate monitoring and reporting program for the South Mountain oil and gas field.

86.     Defendant's ongoing failure to develop and implement an adequate monitoring and reporting program are evidenced by, *inter alia*, its failure to conduct all required monthly visual observations during the past five wet seasons, its failure to

COMPLAINT

properly record all visual observations, and its failure to monitor storm water discharges for iron and other chemicals likely to be present in the Facility's discharges.

87.     Each day since April 5, 2011, that Defendant has failed to develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous violations of the Act.

## VII.   RELIEF REQUESTED

Wherefore, Plaintiff respectfully requests that this Court grant the following relief:

a.  Declare Defendant to have violated and to be in violation of the Act as alleged herein;

b.  Enjoin Defendant from discharging polluted storm water from the Facility unless authorized by the 2015 Permit;

c.  Enjoin Defendant from further violating the substantive and procedural requirements of the 2015 Permit;

d.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that are equivalent to BAT or BCT;

e.  Order Defendant to immediately implement storm water pollution control and treatment technologies and measures that prevent pollutants in the Facility's storm water from contributing to violations of any water quality standards;

f.  Order Defendant to comply with the Permit's monitoring and reporting requirements, including ordering supplemental monitoring to compensate for past monitoring violations;

g.  Order Defendant to prepare a SWPPP consistent with the Permit's

COMPLAINT

1  requirements and implement procedures to regularly review and update the SWPPP;

2         h.  Order Defendant to provide Plaintiff with reports documenting the

3  quality and quantity of their discharges to waters of the United States and their efforts

4  to comply with the Act and the Court's orders;

5         i.  Order Defendant to pay civil penalties of up to $37,500 per day per

6  violation for each violation of the Act since April 5, 2011 pursuant to Sections 309(d)

7  and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

8         j.  Order Defendant to take appropriate actions to restore the quality of

9  waters impaired or adversely affected by their activities;

10         k.  Award Plaintiff's costs (including reasonable investigative, attorney,

11  witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C.

12  § 1365(d); and,

13         l.  Award any such other and further relief as this Court may deem

14  appropriate.

15

16  Dated: April 5, 2016                    Respectfully submitted,

17                                          LOZEAU DRURY LLP

18

19                              By:    __/s/ Douglas J. Chermak_____

20                                     Douglas J. Chermak

21                                     LOZEAU DRURY LLP
                                       410 12th Street, Suite 250
22                                     Oakland, CA 94607
                                       Tel: (510) 836-4200
23                                     Fax: (510) 836-4205

24

25                                     __/s/ Brian Segee (as authorized on 4/5/16)__

26                                     Brian Segee
                                       ENVIRONMENTAL DEFENSE CENTER
27                                     111 W. Topa Topa Street
                                       Ojai, CA  93023
28

COMPLAINT

Tel: (805) 640-1832
Fax: (805) 648-8043

Attorneys for Plaintiff
ENVIRONMENTAL DEFENSE CENTER

COMPLAINT